HAEGGQUIST & ECK, LLP
ALREEN HAEGGQUIST (221858)
  alreenh@haelaw.com
AARON M. OLSEN (259923)
  aarono@haelaw.com
225 Broadway, Suite 2050
San Diego, CA  92101
Telephone: (619) 342-8000
Facsimile: (619) 342-7878

LAGUARDIA LAW
ERIC A. LAGUARDIA (272791)
  eal@laguardialaw.com
402 West Broadway, Suite 800
San Diego, CA 92101
Telephone: (619) 655-4322
Facsimile: (619) 655-4344

Attorneys for Plaintiff and the Proposed Class

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PHILLIP GARCIA, on Behalf of Himself and All Others Similarly Situated, | Case No.: '17 CV 1803 JM   AGS |
| | CLASS ACTION |
| Plaintiff, | CLASS ACTION COMPLAINT |
| v. | |
| SHOWTIME NETWORKS, INC., a Delaware Corporation; WILLIAM MORRIS ENDEAVOR ENTERTAINMENT, LLC, a Delaware Corporation; ZUFFA, LLC, a Nevada Corporation; and DOES 1-10, Inclusive | |
| Defendants. | DEMAND FOR JURY TRIAL |

HAEGGQUIST & ECK, LLP

HAEGGQUIST & ECK, LLP

Plaintiff Phillip Garcia ("Plaintiff"), by and through his attorneys, brings this action on behalf of himself and the Class[1] against Showtime Networks, Inc. ("Showtime"), William Morris Endeavor Entertainment, LLC *d/b/a* WME-IMG ("WME"), and Zuffa, LLC *d/b/a* Ultimate Fighting Championship ("UFC"), a wholly owned subsidiary of WME (collectively, "Defendants"). Plaintiff makes the following allegations upon information and belief (except those allegations as to the Plaintiff or his attorneys, which are based on personal knowledge), based upon an investigation that is reasonable under the circumstances, which allegations are likely to have evidentiary support after a reasonable opportunity for further investigation and/or discovery.

## NATURE OF THE CASE

1.       On August 26, 2017, Showtime aired what it promoted as an "unprecedented superfight" between boxing legend Floyd Mayweather and UFC superstar Conor McGregor in a 12-round boxing showdown at the T-Mobile Arena in Las Vegas, Nevada. The superfight was the main event of a Showtime Pay-Per-View ("PPV") boxing card, which included three additional fights on the main card: (1) Andrew Tabiti vs. Steve Cunningham (cruiserweight); (2) Badou Jack vs. Nathan Cleverly (light heavyweight); and (3) Gervonta Davis vs. Francisco Fonseca (junior lightweight) (collectively referred to as the "PPV Fight").

2.       Showtime offered to millions of consumers an opportunity to "witness history" by airing the PPV Fight for about $99.95 through (1) television cable and satellite providers (the "Television"), or (2) through Apps such as UFC Fight Pass or the Showtime App where consumers could watch the PPV Fight via the internet using live online streaming (the "Live Stream"). This case involves the Live Stream which, unfortunately, was defective and failed to conform to the promises and representations

---

[1]       The "Class" is defined in ¶34 below.

CLASS ACTION COMPLAINT

made by Defendants and was not fit for its intended purpose. Contrary to Defendants' promises and representations, the Live Stream: (1) failed to stream the entire PPV Fight for which Plaintiff and the Class purchased; (2) caused the main event fight to be delayed by about 50 minutes; and (3) failed to have sufficient bandwidth which resulted in, *inter alia*, system failures (hereinafter, the "Defect").

3.     To redress the harms suffered, Plaintiff, on behalf of himself and the Class, brings claims for: (1) violation of California's Song-Beverly Consumer Warranty Act ("Song-Beverly Act"), Civil Code §§1790, *et seq*. (Implied Warranty of Merchantability); (2) violation of California's Consumer Legal Remedies Act ("CLRA"), Civil Code §§1750, *et seq*.; (3) Quasi-Contract (*a/k/a* Unjust Enrichment); and (4) violation of California's Unfair Competition Law ("UCL"), Business & Professions Code §§17200, *et seq*.

**THE PARTIES**

**Defendants**

4.     Defendant Showtime Networks, Inc. is a Delaware Corporation with its principal place of business located at 51 West 52nd Street, New York, New York 10019. Showtime, a wholly-owned subsidiary of CBS Corporation, owns, operates, markets, and distributes, among other things, sports and entertainment events for exhibition to subscribers on a pay-per-view basis through SHOWTIME PPV.[2] Showtime was the owner, operator, marketer, distributer, and seller of the Live Stream of the PPV Fight. Based on information and belief, Showtime also contracted with authorized agents to directly sell the PPV Fight to consumers, including Microsoft Corporation ("Microsoft"), UFC, Apple, Inc., and many others.

HAEGGQUIST & ECK, LLP

---

[2]     http://www.sho.com/about (last visited August 31, 2017).

5.       Defendant William Morris Endeavor Entertainment, LLC *d/b/a* WME-IMG is a Delaware Corporation with its principal place of business located at 9601 Wilshire Boulevard, Beverly Hills, California, 90210.

6.       Defendant Zuffa, LLC, a wholly owned subsidiary of WME, is a Nevada Corporation with its principal place of business located at 2960 West Sahara Avenue, Suite 100, Las Vegas, Nevada, 89102. Zuffa, LLC and WME do business under the name of Ultimate Fighting Championship ("UFC").

7.       WME and Zuffa, LLC, doing business as UFC, own, operate, market, distribute, and sell a subscription-based internet streaming service called UFC.tv (www.ufc.tv). UFC.tv consists of both a 24-hour linear streaming channel (UFC Fight Pass) and pay-per-view programming from UFC's library. Consumers can access UFC.tv to watch events live online on virtually any device, including IOS and Android devices, Xbox One, Xbox 360, AppleTV, Chromecast, Roku, Samsung, and LG Smart TVs. For example, in 2011, UFC on-demand-content was launched for the Xbox, enabling those with a Microsoft Xbox to access on-demand content using UFC.tv's app to stream live video through an internet connection. Consumers, such as Plaintiff who have a device such as the Xbox, could purchase the PPV Fight through Microsoft (who owns Xbox and was an authorized agent of Showtime to sell the PPV Fight) and watch the Live Stream of the PPV Fight using the UFC.tv app. Based on information and belief, UFC contracted with Showtime and was one of Showtime's authorized retailers of the Live Stream of the PPV Fight. Based on information and belief, UFC was also partnered with NeuLion as its streaming partner.

**Plaintiff**

8.       Plaintiff is now, and at all relevant times was, a resident of San Diego, California. Plaintiff brings this action in his individual capacity and on behalf of the Class. As set forth below, Plaintiff purchased the Live Stream of the PPV Fight in San Diego, California.

CLASS ACTION COMPLAINT

HAEGGQUIST & ECK, LLP

9.       Plaintiff is, and has been since he was a child, an avid boxing fan. Growing up, he boxed at the infamous Gleason's Gym in Brooklyn, New York. Plaintiff watches boxing and mixed martial arts matches through online connections on about a weekly basis. Plaintiff learned of the PPV Fight weeks in advance of the August 26, 2017 official public announcement and became very excited.

10.       From Defendants' marketing and advertising, Plaintiff learned not only that Mayweather and McGregor would be fighting in the main event, but that fighters such as Andrew Tabiti and Badou Jack would be fighting on the main card and for title belts – fighters who Plaintiff was well-aware of. Plaintiff did not purchase the PPV Fight to watch only the main event; he purchased it to be able to watch the *entire* PPV Fight, including the other three fights on the main card, including the Tabiti vs. Cunningham fight for a vacant cruiserweight title.

11.       Plaintiff was lured into and watched Showtime's promotional video of the PPV Fight, along with the other online promotional materials advertising the PPV Fight. The Live Stream was advertised as viewable in one simultaneous stream in high definition ("HD"). Based on Defendants' advertising and marketing, and common sense, Plaintiff reasonably expected to be able to watch the entire PPV Fight, continuously and without interruption in service, in HD via the Live Stream.

12.       It was because of the above-identified representations and expectations that Plaintiff purchased Showtime's Live Stream of the PPV Fight.

13.       All of Plaintiff's equipment and software (*e.g.*, Xbox One, Motorola Surfboard modem, and ISP connection), met (and exceeded) all the minimum technical requirements to be able to watch the Live Stream of the PPV Fight. Prior to, during, and after the PPV Fight, Plaintiff's equipment was up-to-date and was otherwise fully functional without any problems or issues.

14.       A few hours before the 6:00 p.m. PST start time of the PPV Fight on August 26, 2017, Plaintiff purchased the PPV Fight through Microsoft for $99.95,

plus $8.05 in tax, for a total payment of $108, which was supposed to enable Plaintiff to watch the Live Stream of the PPV Fight through the UFC.tv app on his Xbox One.

15.    Plaintiff quickly learned that Defendants' Live Stream was defective and unable to stream the PPV Fight as promised. About 15 minutes before the 6:00 p.m. PST start time, Plaintiff attempted to access the PPV Fight via the Live Stream, but due to Defendants' defective system (*see* ¶¶23-29, below), Plaintiff was not able to access the PPV Fight. Plaintiff attempted to contact UFC's customer support via its online "live help" chat, which was where he was directed for technical issues during live events, but the chat link did not (and still does not) work.

16.    Plaintiff continued to repeatedly try to access the PPV Fight via Live Stream, but he was unable to access it because of Defendants' defective system until after the 6:00 p.m. PST start time and after several rounds of the Tabiti fight were already over. The Live Stream continued to suffer system failures, and Plaintiff's Live Stream froze and then resumed during the PPV Fight. In addition, due to Defendants' defective system, the main event between Mayweather and McGregor was delayed by about 50 minutes, causing a material disruption in Plaintiff's planned evening schedule.

17.    Had Plaintiff known of Defendants' defective system causing the Defect, Plaintiff would not have purchased the Live Stream of the PPV Fight. Accordingly, Plaintiff reasonably seeks restitution of the money he paid for the defective Live Stream product.

## JURISDICTION AND VENUE

18.    The Court has jurisdiction over the lawsuit under 28 U.S.C. §1332(a)(1) because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000, excluding interest and costs. The Court also has jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d)(2), because the suit is a class action, the parties are minimally diverse, and the amount in controversy exceeds $5,000,000, excluding interest and costs. The Court has

supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

19.   This Court has personal jurisdiction over Defendants because they do a substantial amount of business in California, including in this District; are authorized to conduct business in California, including in this District; and have intentionally availed themselves of the laws and markets of this District through the promotion, sale, marketing, and/or distribution of their products and services.

20.   Venue is proper in this district under 28 U.S.C. §1391(a)(1) and (a)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this district. Venue is also proper under 18 U.S.C. §1965(a), because Defendants transact a substantial amount of its business in this District.

## FACTUAL BACKGROUND

21.   Prior to the PPV Fight, virtually every major reporting agency was predicting record-setting audience viewing for the PPV Fight, claims that appear to have come true. Sources are reporting that UFC's President, Dana White, reported that the PPV Fight obtained a record 6.5 million PPV buys, likely bringing in more than $650 million in PPV business.

22.   This turnout was expected by Defendants. The PPV Fight was marketed as the biggest fight in boxing history. It has been publicly reported that Mayweather participated in the three biggest PPV fights in history prior to the PPV Fight: (1) 2015 Pacquiao fight (4.6 million PPV buys); (2) 2007 Oscar De La Hoya fight (2.4 million buys); and (3) 2013 Alvarez fight (2.2 million buys). McGregor, on the other hand, is the biggest drawer of PPV buys for the UFC (mixed martial arts fighting) in recent history: (1) second fight against Nate Diaz (1.65 million buys); (2) first fight against Diaz (1.5 million buys); and (3) Alvarez fight (1.3 million buys). In other words, Defendants knew, and expected, for the PPV buys, including for the Live Stream of the PPV Fight, to be record setting in the many millions. Based on prior history,

HAEGGQUIST & ECK, LLP

Defendants also knew that many of these PPV buys are not made until soon before the fight.

23.    Unfortunately, despite knowing many millions of consumers would be purchasing and watching the PPV Fight via Live Stream commencing around 6:00 p.m. PST on August 26, 2017, Defendants knowingly did not have a system that could handle the expected internet traffic resulting from the Live Stream of the PPV Fight.

24.    Based on information and belief, Defendants knowingly did not secure sufficient networking bandwidth to support the substantial number of subscribers who paid to watch the PPV Fight via Live Stream. Bandwidth governs access to the internet, the speed of that data, images, and video that can be uploaded and downloaded, and where usage will be problematic. Defendants knew their system could not conform to the representations made about its product, based on, *inter alia*, Defendants' available bandwidth and anticipated and known subscriber numbers.

25.    As a result, reports from hundreds of consumers immediately started to appear in online forums, such as Twitter, around the 6:00 p.m. PST start time, complaining about receiving error messages and an inability to login to the Live Stream of the PPV Fight. Even though consumers were using different devices and apps to access the Live Stream of the PPV Fight, they faced the same problem – the inability to access the PPV Fight. Due to the defective system, Showtime was forced to delay the start of the main event and publicly acknowledge the problem:

> Due to high demand, we have reports of scattered outages from various cable and satellite provides [*sic*] and the online offering. We will delay the start of the main event slightly to allow for systems to get on track. We do not expect a lengthy delay.

26.    Public reporting since the PPV Fight have credited the delay due to bandwidth issues, including servers having crashed due to the amount of traffic volume.

HAEGGQUIST & ECK, LLP

27.     The UFC also publicly acknowledged the defective system on Twitter:



28.     As the problem persisted, the UFC ultimately advised its customers to "find an alternate provider":



29.     Due to the defective system, including Defendants' knowing failure to secure sufficient networking bandwidth, consumers continued to receive error messages and get dropped from the Live Stream at intermittent times throughout the PPV Fight. The usage was not seamless and the speed of the data was slowed and even stopped at certain points. Despite knowing its system was defective and unable to handle the expected and known volume of traffic, Defendants failed to inform Plaintiff and the Class of the same because Defendants knew the PPV Fight was going to be the most lucrative PPV event in history. Indeed, reports are estimating revenue of the PPV Fight to be between $650 million to $1 billion.

8

HAEGGQUIST & ECK, LLP

30.   Admitting its system was defective, Showtime has since offered full refunds to customers, but *only* those who "purchased the event *directly* from Showtime and were unable to receive the telecast." In other words, Showtime is offering refunds for customers who purchased the PPV Fight through Showtime's own direct-to-consumer services. However, if a customer, such as Plaintiff, purchased the PPV Fight through one of Showtime's authorized sellers, such as Microsoft, UFC, *et al.*, Showtime is refusing to offer refunds.

31.   All consumers who purchased the defective Live Stream of the PPV Fight should be issued refunds. Hence, Plaintiff brings this class action to seek to remedy the wrong, and not allow Defendants to be unjustly enriched.

## CLASS ACTION ALLEGATIONS

32.   Plaintiff realleges and incorporates herein by reference each allegation in the preceding and subsequent paragraphs.

33.   Plaintiff brings this action on behalf of himself individually and other similarly situated persons as a class action pursuant to Federal Rule of Civil Procedure 23.

34.   Plaintiff seeks to represent the following class:

All consumers who purchased the Live Stream of the PPV Fight in California, and who did not receive a refund (the "Class").

35.   Excluded from The Class are Defendants, their officers and directors, families, legal representatives, heirs, successors or assigns, any entity in which Defendants have a controlling interest, and any Judge assigned to this case, and their immediate families.

36.   Plaintiff reserves the right to amend or modify the class definition in connection with his motion for class certification, as a result of discovery, at trial, or as otherwise allowed by law.

HAEGGQUIST & ECK, LLP

CLASS ACTION COMPLAINT

37.    Plaintiff brings this action on behalf of himself and all others similarly-situated because there is a well-defined community of interest in the litigation and the proposed sub-classes are easily ascertainable.

### Numerosity

38.    The potential members of the Class are so numerous, joinder of all the members is impracticable. While the precise number of members of the Class has not been determined, Plaintiff is informed and believes the Class consists of thousands of consumers.

39.    Based on information and belief, Defendants' sales records and data evidence the exact number and location of the Class respectively.

### Commonality and Predominance

40.    There are questions of law and fact common to the Class that predominate over any questions affecting only individual class members. These common questions of law and fact include, without limitation:

(a)    Whether Defendants made uniform representations about the characteristics, benefits, uses, standards, quality, and/or grade of the Live Stream of the PPV Fight;

(b)    Whether Plaintiff and the Class purchased a product and/or service, namely the Live Stream of the PPV Fight, that was defective and/or failed to conform to the representations made by Defendants;

(c)    Whether the Live Stream Defect would be considered material by a reasonable consumer;

(d)    Whether Defendants had a duty to disclose the fact of its defective system causing the Defect;

(e)    Whether Defendants violated the CLRA;

(f)    Whether Defendants violated the UCL;

HAEGGQUIST & ECK, LLP

CLASS ACTION COMPLAINT

1    (g)    Whether Defendants breached the implied warranty of

2    merchantability;

3    (h)    Whether Defendants were unjustly enriched through their

4    wrongful acts; and

5    (i)    Whether Plaintiff and the Class have been harmed and the proper

6    measure of relief.

### Typicality

41.    The claims of Plaintiff are typical of the claims of the Class. Plaintiff and all members of the Class sustained injuries and damages arising out of and caused by Defendants' common course of conduct in violation of laws and statutes as alleged herein.

### Adequacy of Representation

42.    Plaintiff will fairly and adequately represent and protect the interest of the Class. Counsel who represents Plaintiff are competent and experienced in litigating large consumer class actions.

### Superiority of Class Action

43.    A class action is superior to other available means for the fair and efficient adjudication of this controversy. Individual joinder of the Class is not practicable, and questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class. Each member of the Class has been damaged and is entitled to recovery because of Defendants' uniform unlawful practices described herein. There are no individualized factual or legal issues for the court to resolve that would prevent this case from proceeding as a class action. Class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system. Plaintiff is unaware of any difficulties that are likely to be

HAEGGQUIST & ECK, LLP

CLASS ACTION COMPLAINT

encountered in the management of this action that would preclude its maintenance as a class action.

**COUNT I**

**Violation of California's Song-Beverly Consumer Warranty Act, Civil Code §§1790, *et seq.* (Implied Warranty of Merchantability)**

44.     Plaintiff hereby alleges and incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

45.     In California, "every sale of consumer goods that are sold at retail in this state shall be accompanied by the manufacturer's and the retail seller's implied warranty that the goods are merchantable." Civil Code §1792. "The retail seller shall have a right of indemnity against the manufacturer in the amount of any liability under this section." *Id.* "Any buyer of consumer goods who is damaged by a failure to comply with any obligation under [the Song-Beverly Act] or under an implied or express warranty or service contract may bring an action for the recovery of damages and other legal and equitable relief." Civil Code §1794(a).

46.     "Implied warranty of merchantability" means that the consumer goods meet all the following: (1) pass without objection in the trade under the contract description; (2) are fit for the ordinary purposes for which such goods are used; (3) are adequately contained, packaged, and labeled; and (4) conform to the promises or affirmations of fact made on the container or label. Civil Code §1791.1(a)(1)-(4).

47.     Here, all the elements for a claim for breach of implied warranty of merchantability are satisfied: (1) Plaintiff (and the Class) was a "retail buyer" (2) of "consumer goods" (Live Stream of the PPV Fight) (3) purchased from a "retail seller," and (4) the consumer goods purchased were not merchantable.

48.     Specifically, Plaintiff is, and at all relevant times was, a "buyer" or "retail buyer" within the meaning of the Song-Beverly Act, Civil Code §1791(b), because he is an individual who bought a consumer good (the Live Stream of the PPV Fight)

HAEGGQUIST & ECK, LLP

12

from a person (Microsoft) engaged in the business of manufacturing, distributing, or selling consumer goods at retail. Plaintiff bought the Live Stream from Microsoft, who was Showtime's authorized retail seller. Based on information and belief, Mircrosoft also has a contract(s) with UFC, and it was authorized to sell the PPV Fight to be viewed via Live Stream using UFC's app.

49.    Microsoft is, and at all relevant times was, a "retail seller," "seller," and "retailer," within the meaning of the Song-Beverly Act, Civil Code §1791(l) because it is a corporation that engages in the business of selling consumer goods to retail buyers. As Showtime's authorized retail seller, Microsoft distributed and sold the Live Stream of the PPV Fight to buyers. Microsoft also sells numerous other consumer goods to buyers, such as Xbox entertainment systems, laptop computers, software, and other products.

50.    Showtime is, and at all relevant times was, a "retail seller," "seller," and "retailer," within the meaning of the Song-Beverly Act, Civil Code §1791(l) because it is a corporation that engages in the business of selling consumer goods to retail buyers. Showtime not only sold the Live Stream of the PPV Fight indirectly to buyers such as Plaintiff through its authorized retail sellers, but it also sold the Live Stream of the PPV Fight directly to buyers. Showtime also sells other consumer goods to buyers, such as cable and satellite television network programs, On Demand television programs, and other video content products.

51.    UFC is, and at all relevant times was, a "retail seller," "seller," and "retailer," within the meaning of the Song-Beverly Act, Civil Code §1791(l) because it is a corporation that engages in the business of selling consumer goods to retail buyers. As Showtime's authorized retail seller, UFC distributed and directly sold the Live Stream of the PPV Fight to buyers. UFC also sells other consumer goods to buyers, such as on-demand video of pre-recorded content and live online streaming of video content, among other goods.

52.      Based on information and belief, Showtime is, and at all relevant times was, a "manufacturer" within the meaning of the Song-Beverly Act, Civil Code §1791(j) because it is a corporation that manufactures, assembles, or produces consumer goods, including the Live Stream of the PPV Fight.

53.      Based on information and belief, Microsoft is, and at all relevant times was, a "manufacturer" within the meaning of the Song-Beverly Act, Civil Code §1791(j) because it is a corporation that manufactures, assembles, or produces consumer goods.

54.      Based on information and belief, UFC is, and at all relevant times was, a "manufacturer" within the meaning of the Song-Beverly Act, Civil Code §1791(j) because it is a corporation that manufactures, assembles, or produces consumer goods.

55.      The Live Stream of the PPV Fight purchased from Microsoft by Plaintiff in San Diego, California, is a "consumer good" within the meaning of the Song-Beverly Act, Civil Code §1791(a) because it was a new product bought by Plaintiff for use primarily for personal, family, and household purposes, and it is not clothing or a consumable.

56.      The Song-Beverly Act does not require "privity" between Plaintiff and Showtime or the UFC to assert an implied warranty claim. *Sater v. Chrysler Group LLC*, Case No. EDCV 14-00700-VAP (DTBx), 2015 U.S. Dist. LEXIS 21022, *20-21 (C.D. Cal. Feb. 20, 2015) ("The SBA does not require privity to assert an implied warranty claim (either for merchantability or fitness)."); *Ehrlich v. BMW of N. Am., LLC*, 801 F. Supp. 2d 908, 921 (C.D. Cal. Aug. 11, 2010) (same) (listing cases). Moreover, Microsoft contracted with Showtime and UFC to be an authorized retail seller of the Live Stream and Plaintiff is a third-party beneficiary of those agreements. Accordingly, even if privity was required, which it is not under the Song-Beverly Act by the plain language of the statute, Plaintiff's transaction in purchasing the Live Stream is a well-established exception to the privity requirement. *Id.*

HAEGGQUIST & ECK, LLP

57.    Defendants warranted that the Live Stream of the PPV Fight were of merchantable quality and fit for the ordinary purposes for which the product is used.

58.    Defendants breached the implied warranty of merchantability because the Live Stream of the PPV Fight purchased by Plaintiff and the Class was not merchantable because it was not fit for the ordinary purposes for which such goods are used (Civil Code §1791.1(a)(2)), and it did not conform to the promises or affirmations of fact made by Defendants (Civil Code §1791.1(a)(4)). As stated above, the Live Stream of the PPV Fight was defective and suffered from material system failures which resulted in the Defect. The product did not perform as reasonably expected and was not of the quality that would be reasonably expected for online live streaming content for an event of this magnitude. Because the product at issue enabled the viewing of a "live" event, the Defect was material because the "live" experience cannot be re-duplicated – once it is over, it is over, and the Defect stripped users of this once in a lifetime experience to see history in the making in real-time.

59.    Because of Defendants' conduct, Plaintiff and the Class have suffered injury and damages in an amount to be determined at trial. Plaintiff and the Class are entitled to recover damages and other legal and equitable relief. Civil Code §1794(a).

60.    Plaintiff is also entitled to recover costs and expenses, including attorneys' fees pursuant to Civil Code §1794(d), and any other applicable provision for attorneys' fees and costs.

## COUNT II

### Violation of the California Consumer Legal Remedies Act, Civil Code §§1750, *et seq*.

61.    Plaintiff hereby alleges and incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

62.    This cause of action arises under the CLRA, Civil Code §§1750, *et seq*. Plaintiff and the Class are consumers as defined by Civil Code §1761(d). The Live

HAEGGQUIST & ECK, LLP

Stream of the PPV Fight constitute "goods" and/or "services" as defined by Civil Code §§1761(a) and (b). Defendants constituted "persons" under Civil Code §1761(c), and Plaintiff and the Class purchases of the Live Stream of the PPV Fight constitute "transactions," as defined in Civil Code §1761(e).

63.   Defendants violated the CLRA by engaging in the following deceptive practices proscribed by Civil Code §1770(a), in transactions with Plaintiff and the Class, that were intended to result and which resulted in the sale of goods and/or services to a consumer:

(a)   In violation of Civil Code §1770(a)(5), Defendants' acts and practices constitute material misrepresentations that the Live Stream of the PPV Fight in question have characteristics, benefits, or uses which they did not have;

(b)   In violation of Civil Code §1770(a)(7), Defendants misrepresented that the Live Stream of the PPV Fight was of a particular standard, quality and/or grade, when it was of another;

(c)   In violation of Civil Code §§1770(a)(5) and (a)(7), Defendants omitted and/or failed to disclose to Plaintiff and the Class material facts that were contrary to representations made by Defendants about the characteristics, benefits, uses, standard, quality, and/or grade of the Live Stream of the PPV Fight; and

(d)   In violation of Civil Code §1770(a)(9), Defendants advertised the Live Stream of the PPV Fight with the intent not to sell it as advertised or represented.

64.   Defendants had exclusive knowledge of its defective system causing the Defect and failed to disclose such to Plaintiff and the Class.

65.   Because of Defendants' unlawful conduct, Plaintiff and the Class have suffered injury and damage in an amount to be determined at trial.

66.   Pursuant to Civil Code §1782, on September 6, 2017 Plaintiff notified Defendants in writing by certified mail of the violations of Civil Code §1770, and have demanded that Defendants remedy the violations as detailed herein and to give notice to all affected consumers of its intent to so act. Plaintiff sent this notice by

HAEGGQUIST & ECK, LLP

16

certified mail, return receipt requested, to each of Defendants' principal place of business.

67.     If Defendants fail to remedy the violations or give notice to all affected consumers within 30 days after receipt of the Civil Code §1782 notice, Plaintiff will seek to amend this Complaint and seek actual damages and punitive damages for violations of the CLRA.

68.     Pursuant to Civil Code §1780(a)(2), Plaintiff seeks equitable and injunctive relief because of the violations of the CLRA.

69.     Plaintiff and the Class are also entitled to recover attorneys' fees, costs, expenses, and disbursements pursuant to Civil Code §§1780 and 1781.

## COUNT III

### Quasi-Contract (Unjust Enrichment)
### Seeking Restitution

70.     Plaintiff hereby alleges and incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

71.     Where a defendant has been unjustly conferred a benefit "through mistake, fraud, coercion, or request" the return of that benefit is a remedy sought in "a quasi-contract cause of action." *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015). When a plaintiff alleges "unjust enrichment, a court may 'construe the cause of action as a quasi-contract claim seeking restitution." *Id.*

72.     Plaintiff and the Class conferred a benefit on Defendants, namely, money, because of Defendant's representations and implied warranty that it would provide Plaintiff and the Class with a fully functioning Live Stream of the PPV Fight. Defendants accepted the benefit of money from Plaintiff and the Class and it would be unfair for Defendants to retain the benefit because the goods were not merchantable because they were not fit for the ordinary purposes for which such goods are used and did not otherwise conform as promised and expected.

73.     Because of Defendants' unlawful conduct, Plaintiff and the Class have suffered injury and, thus, they are entitled to restitution of the money they conferred on Defendants.

## COUNT IV

### Violation of California's Unfair Competition Law,
### Business & Professions Code §§17200, *et seq.*

74.     Plaintiff hereby alleges and incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

75.     California Business & Professions Code §17200 prohibits acts of unfair competition, which means and includes any "unlawful, unfair or fraudulent business act or practice" and any act prohibited by California Business & Professions Code §17500.

76.     Defendants engaged in unlawful activity prohibited by Business & Professions Code §§17200, *et seq.* The actions of Defendants as alleged within this Complaint constitute unlawful and unfair business practices with the meaning of Business & Professions Code §§17200, *et seq.*

77.     Defendants have conducted the following unlawful activities:

(a)     Violation of the Song-Beverly Act, Civil Code §§1790, *et seq.*, by breaching the implied warranty of merchantability;

(b)     Violation of the CLRA, Civil Code §§1750, *et seq.* by engaging in deceptive practices proscribed by Civil Code §1770; and

(c)     Unjust enrichment, by unfairly taking Plaintiff's and the Class' money without conferring a promised benefit.

78.     Defendants' activities also constitute unfair practices in violation of Business & Professions Code §§17200, *et seq.*, because Defendants' practices violate the above noted laws, and/or violate an established public policy, and/or the practice

HAEGGQUIST & ECK, LLP

18

CLASS ACTION COMPLAINT

is immoral, unethical, oppressive, unscrupulous, and substantially injurious to Plaintiff and the Class.

79.    Defendants' also violated the UCL's prohibition against fraudulent business acts or practices through their misrepresentations regarding the Live Stream of the PPV Fight that had a tendency to mislead the public and with intent to induce reliance of Plaintiff and the Class.

80.    Because of Defendants' violations of the noted laws, Plaintiff and the Class have suffered injury-in-fact and have lost money or property because of Defendants' practices. The injury includes the money Plaintiff and the Class paid for the Live Stream of the PPV Fight. Plaintiff and the Class are entitled to restitution, an injunction, declaratory, and other equitable relief against such unlawful practices to prevent future damage for which there is no adequate remedy at law.

81.    Plaintiff is also entitled to and hereby claims attorneys' fees and costs, pursuant to the private attorney general theory doctrine (Code of Civil Procedure §1021.5), and any other applicable provision for attorney fees and costs, based upon the violation of the underlying public policies.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for judgment against Defendants as follows:

A.    That the Court determine that this action may be maintained as a class action with the named Plaintiff appointed as The Class Representative;

B.    For the attorneys appearing on the above-caption to be named Class counsel;

C.    For nominal, actual, and compensatory damages, according to proof at trial;

D.    For restitution of all monies, expenses, and costs due to Plaintiff and the Class;

1       E. For disgorged profits from the unlawful and unfair business

2    practices in violation of Business & Professions Code §§17200, *et seq.*;

3       F. For reasonable attorneys' fees, expenses, costs, and interest

4    pursuant to Civil Code §§1780, 1781, and 1794, Code of Civil Procedure §1021.5,

5    and as otherwise allowed by law;

6       G. For equitable relief pursuant to Business & Prof Code §§17200, *et*

7    *seq.*, and as otherwise allowed by law;

8       H. For declaratory relief as deemed proper;

9       I. For pre-judgment and post-judgment interest to the extent

10   allowable by law; and

11      J. For such other and further relief as the Court deems just and

12   proper.

13   **DEMAND FOR JURY TRIAL**

14     Plaintiff, on behalf of himself and the Class, demand trial by jury on all issues

15   so triable.

16   Dated: September 6, 2017   HAEGGQUIST & ECK, LLP

17              ALREEN HAEGGQUIST (221858)
           AARON M. OLSEN (259923)

18

19            By: _____

20               AARON M. OLSEN

21

22            225 Broadway, Suite 2050
         San Diego, CA  92101

23            Telephone: (619) 342-8000
         Facsimile: (619) 342-7878

24

25

26

27

28

*HAEGGQUIST & ECK, LLP*

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LAGUARDIA LAW
ERIC A. LAGUDIA (272791)
402 W. Broadway, Suite 800
San Diego, CA 92101
Telephone: (619) 655-4322
Facsimile: (619) 655-4344

Attorneys for Plaintiff and the Proposed
Class

HAEGGQUIST & ECK, LLP

21
CLASS ACTION COMPLAINT

**Affidavit of Aaron M. Olsen re Venue for CLRA Count**

I, Aaron M. Olsen, am an attorney admitted to practice before this Court and I am counsel of record for Plaintiff in the above-captioned matter. I make this affidavit pursuant to California Civil Code §1780(d). Venue is proper in this District because it is within the county where Plaintiff's transaction at issued in this Complaint occurred. I declare under penalty of perjury under the laws of the United States of America the above is true and correct and of my own personal knowledge.

Dated:    September 6, 2017    _____

AARON M. OLSEN

CLASS ACTION COMPLAINT

HAEGGQUIST & ECK, LLP